USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/11/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\-------------------------------------------------------------X
DAVID WEXLER,                                        :
                                                     :
                              Plaintiff,             :
                                                     :           20-CV-1100 (VEC)
                      -against-                       :
                                                     :           OPINION & ORDER
                                                     :
HASBRO, INC.,                                        :
                              Defendant.             :
\-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

David Wexler, a toy inventor, has sued Hasbro, Inc. ("Hasbro"), alleging that the toy

company unlawfully used two of his ideas without paying him royalties. Wexler asserted claims

for breach of contract, misappropriation, unfair competition, and unjust enrichment. Hasbro

moved for summary judgment. For the following reasons, Hasbro's motion for summary

judgment is GRANTED.

## BACKGROUND

Wexler invents toys and games for a living.[1] Pl. 56.1 Stmt., Dkt. 68 ¶ 206.[2] Many

professional toy inventors, including Wexler, pitch ideas to toy companies, in the hopes that a

company will license and develop their proposal in return for royalties. *Id.* ¶¶ 217, 366, 368,

369. Hasbro, a global toy and game company, regularly meets with outside inventors who

present their ideas to representatives from Hasbro's Products Acquisitions department.[3] *Id.* ¶¶

---

[1]      Wexler became interested in the profession from his father, who has a longstanding career inventing toys
and games, including the well-known game Connect 4. Resp., Dkt. 55 at 2.

[2]      There are two Rule 56.1 Statements cited in this Opinion. The Court refers to the Rule 56.1 Statement with
Plaintiff's rendition of the facts and Defendant's responses as Pl. 56.1 Stmt. *See* Pl. 56.1 Stmt., Dkt. 68. The Court
refers to the Rule 56.1 Statement with Defendant's rendition of the facts and Plaintiff's responses as Def. 56.1 Stmt.
*See* Def. 56.1 Stmt., Dkt. 62.

[3]      The department was historically called "Inventor Relations." Pl. 56.1 Stmt. ¶ 217 (Def. Resp.).

214, 217.  At the end of each meeting, a Hasbro representative records the pitched ideas on an Inventor Review Record form and notes his or her disposition for each listed idea.  *Id.* ¶¶ 333, 378; Def. 56.1 Stmt. ¶¶ 4, 6, 7.  A disposition of "Pass" is an outright rejection.  Def. 56.1 Stmt. ¶ 8.  A disposition of "Hold/Send In" means that Hasbro may further consider the idea and will keep or be provided with the materials presented at the meeting.  *Id.* ¶ 9; Pl. 56.1 Stmt. ¶ 334, 338.  And a disposition of "Inventor to do more work," means just that: Hasbro may be willing to reconsider the idea in the future, after additional work by the inventor.  Def. 56.1 Stmt. ¶ 10 (Pl. Resp.).

In a series of meetings between 2007 and 2015, Wexler pitched various toy and game ideas to Hasbro.  Pl. 56.1 Stmt. ¶¶ 228, 252, 254, 257, 259, 266, 267.  One of the ideas, which Wexler alleges he pitched at each of the pertinent meetings, *see id.*, was "a branded collection of combined games, each of which is controlled by Hasbro, and uses combined play pattern of the original games and the games' names together as the name of the new product."  Resp., Dkt. 55 at 11.  Wexler identified the collection with the slogan "Hasbro Presents . . . Mash-Ups . . . The Classics Combined."  Pl. 56.1 Stmt. ¶ 240.  At each of the meetings, Wexler presented illustrative examples of games that could be included in the collection.[4]  *Id.* ¶¶ 243, 244, 253, 255, 258, 260.  Hasbro ultimately passed on the idea, including each of the pitched illustrative examples.  Def. 56.1 Stmt., ¶¶ 38, 42, 45, 49, 52, 54.[5]  The Court will refer to Wexler's proposed collection as the "Mash-Up Idea."

---

[4]     Over the years, Wexler proposed several such examples, including Monopoly/Trouble, Sorry/Transformers, Jenga/Twister, Guess Who?/Memory, Candy Land/Chutes and Ladders, Connect 4/Scrabble, and Yahtzee/Boggle. Def. 56.1 Stmt., Dkt. 62 ¶ 146.

[5]     Hasbro initially marked some of the ideas as "Hold/Send In," *see* Def. 56.1 Stmt. ¶¶ 38, 48–49, 53–54; Pl. 56.1 Stmt. ¶¶ 342, before eventually passing on them.

At an April 30, 2015, meeting, separate from his Mash-Up Idea, Wexler pitched an idea for a game that would combine Connect 4 and Nerf.[6]  Pl. 56.1 Stmt. ¶ 270.  Wexler described his proposal as "an action-based game with a play pattern derived from classic Connect 4 game play, where players use Nerf blasters and projectiles to shoot four in a row on a Connect 4 board inspired grid on a vest."  *Id.* ¶ 271.  Although the idea was initially marked "Hold/Send In" on the Inventor Review Record form, *id.* ¶ 343,[7] Hasbro ultimately passed on the idea, Def. 56.1 Stmt. ¶ 66.  The Court will refer to this idea as "Connect 4/Nerf."

Wexler contends that Hasbro later used both his Mash-Up Idea and his Connect/4 Nerf idea without paying him royalties.  From 2019 to 2020, Hasbro sold a line of products under the name "game mash+ups" at Target.  Def. 56.1 Stmt. ¶¶ 99, 129–131; Pl. 56.1 Stmt. ¶ 295.  The products included the following game combinations: Monopoly/Jenga, Taboo/Speak Out, Guess Who?/Clue, Candy Land/Connect 4, Twister/Scrabble, Simon/Sorry!, The Game of Life/Trouble, and Operation/Perfection.  Def. 56.1 Stmt. ¶¶ 129–131.  Wexler agrees that he never proposed to Hasbro any of the specific combinations in the line of products sold at Target.  *Id.* ¶¶ 146–147.  Additionally, in the fourth quarter of 2019, Hasbro began selling a game called "Connect 4 Blast!"  *Id.* ¶ 141.  The goal of the game is "to dislodge discs from a stand-alone Connect 4 grid by blasting Nerf projectiles at it."  *Id.* ¶ 145.  Although Connect 4 Blast! was also sold at Target, it was not part of the "game mash+ups" line.  *Id.* ¶¶ 102, 142.

---

[6]  For the unacquainted, Connect 4 requires players to take turns placing discs in a grid, to achieve the ultimate goal of four discs in a row.  "Nerf" refers to a type of soft foam rubber used to make a variety of toys, including projectiles that are shot from Nerf brand "blasters."

[7]  The form itself does not mention Nerf.  It lists the item as "Connect 4" and includes the description "Ip based account connect 4.  4 heroes that come together to help the world with evil."  Inventor Review Record, Dkt. 53-7 at 1.  But despite that somewhat convoluted submission description, the parties agree that Wexler's Connect 4/Nerf idea was presented at the April 30, 2015 meeting.  Def. 56.1 Stmt. ¶ 57; Pl. 56.1 Stmt. ¶ 270.

Wexler sued Hasbro for breach of implied contract, misappropriation, unfair competition, and unjust enrichment.  Compl., Dkt. 1 ¶¶ 79–90, 98–114.[8]  Following discovery,[9] Hasbro moved for summary judgment on all claims, *see* Not. of Mot., Dkt. 46, and Wexler opposed, *see* Resp., Dkt. 55.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris,* 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC IXIS N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  Courts "construe the facts in the light most favorable to the nonmoving party and resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (cleaned up).

---

[8]    Wexler also brought a claim for breach of express contract.  *See* Compl., Dkt. 1 ¶¶ 91–97.  In his response to the motion for summary judgment, Wexler states that he "does not intend to pursue Count II of the Complaint, stating a cause of action for breach of express contract" because "[e]vidence adduced during discovery demonstrates that the [contract at issue] relied on by Hasbro do not constitute [an] enforceable agreement between the Parties under New York law."  Resp., Dkt. 55 at 19 n.5.  The Court construes Wexler's statement as a withdrawal of his breach of express contract claim.  Accordingly, the Court declines to consider that claim further, and it is dismissed with prejudice.

[9]    Even recognizing that this case was filed shortly before the COVID-19 pandemic upended the normal practice of law, the parties had an unusually long period of time to conduct fact discovery.  After several extensions, *see* Orders, Dkts. 26, 30, 32, the parties were eventually given almost a year from the time the case was filed to complete fact discovery.

**DISCUSSION**

**I.     Each of Wexler's Claims Requires Proof of Novelty and Use**

Wexler brings four causes of action: breach of implied contract, misappropriation, unfair competition, and unjust enrichment.  Wexler contends that Hasbro breached an implied contract and committed the three torts by using his Mash Up Idea and his Connect 4/Nerf idea to create Hasbro games.  Among other elements unique to each claim, each of Wexler's legal claims requires a showing that his idea was novel[10] and that Hasbro unlawfully used the idea. Accordingly, to survive summary judgment on those claims, there must be genuine disputes of material fact as to whether either of Wexler's ideas was novel and as to whether Hasbro unlawfully used either of the novel ideas.

**A.   Breach of Implied Contract**

Under New York law, "[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (citation omitted).  "An implied contract, like an express contract, requires consideration, mutual assent, legal capacity and legal subject matter."  *Wallace v. Health Quest Sys., Inc.*, No. 20-CV-545, 2021 WL 1109727, at *10 (S.D.N.Y. Mar. 23, 2021) (internal citation omitted).[11]  "For contract-based claims in submission-of-idea cases, a showing of novelty to the buyer will supply sufficient consideration to support a contract."  *Nadel v. Play-By-Play Toys & Novelties, Inc.*,

---

[10]     *See generally Paul v. Haley*, 183 A.D.2d 44, 52–53 (2d Dep't 1992) ("Lack of novelty in an idea is fatal to *any* cause of action for its unlawful use." (emphasis in original) (cleaned up)).

[11]     Because Wexler failed to come forward with specific facts showing a genuine dispute of material fact as to both novelty and use, the Court need not consider whether there is a question of fact with respect to the other elements of a breach of implied contract claim.

5

208 F.3d 368, 376 (2d Cir. 2000).  Additionally, to prove breach of the contract, a plaintiff must

show that the defendant unlawfully used his novel idea.  *Id.* at 377 n.5 (noting that breach of an

implied-in-fact contract requires a "defendant's subsequent use of the idea," among other

requirements); *id.* at 380 n.10 ("In order to recover for breach of contract, a plaintiff must

demonstrate some nexus or causal connection between his or her disclosure and the defendant's

use of the idea, *i.e.*, where there is an independent source for the idea used by the defendant,

there may be no breach of contract, and the plaintiff's claim for recovery may not lie.").[12]  In

short, breach of implied contract in a submission-of-idea case requires proof that the plaintiff's

idea is novel and that the defendant made unauthorized use of the novel idea.

### B.  Misappropriation

Under New York law, the tort of misappropriation of ideas has two elements: a "requisite

legal relationship must exist between the parties, and the idea must be novel and concrete."

*Turner v. Temptu Inc.*, 586 F. App'x 718, 722 (2d Cir. 2014) (collecting cases).[13]  Further, the

plaintiff must prove that his "ideas were actually used by the defendant."  *AEB & Assocs. Design

Grp., Inc. v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994) ("[E]ven where a plaintiff's

concept is novel and original, recovery will be denied where it is established that the party

alleged to have misappropriated another's concept, arrived on its own initiative or by wholly

independent means at a concept similar to that devised by the party seeking recovery for

misappropriation." (internal quotations omitted)).[14]  Thus, similar to the claim of breach of

---

[12]     Wexler recognizes that this claim requires proving both novelty of his ideas and Hasbro's unlawful use of them.  *See* Compl., Dkt. 1 ¶¶ 80, 82, 84, 85 86 (alleging that Hasbro breached the implied contract when it "used" and "commercially exploit[ed]" his "novel" ideas).

[13]     Here too the Court declines to consider whether there are questions of fact with respect to elements outside the novelty of Wexler's ideas and Hasbro's purported use of them.

[14]     Wexler acknowledges that his misappropriation claim requires a showing of novelty and use.  *See* Compl. ¶¶ 99, 100 (alleging that Hasbro's "use" of "Plaintiff's novel and creative idea" constitutes misappropriation).

implied contract, a claim for misappropriation of idea requires a showing that the plaintiff's idea was novel and that the defendant made unauthorized use of the novel idea.

### C.  Unfair Competition

"Unfair competition encompasses the principle that one may not misappropriate the results of the skill, expenditures and labors of a competitor."  *Stuart's, LLC v. Edelman*, 196 A.D.3d 711, 714 (2d Dep't 2021) (internal citations omitted).  Given this principle, misappropriation is considered the "cornerstone" of an unfair competition claim, *see Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 671 (1981), and courts often treat an unfair competition claim as part and parcel of a plaintiff's misappropriation claim, *see, e.g.*, *Nadel*, 208 F.3d at 373 n.2 (treating "Nadel's unfair competition claim as a claim for misappropriation of Nadel's idea"); *Paul v. Haley*, 183 A.D.2d 44, 52–53 (2d Dep't 1992) (finding that plaintiff's unfair competition claim is "based upon the alleged misappropriation of novel ideas contained in the plaintiff's copyrighted manuscript"); *Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 319 n.4 (Sup. Ct. N.Y. Cnty. 2011) ("Plaintiff's claims for misappropriation and unfair competition will therefore be treated as interchangeable and referred to, for purposes of convenience, as misappropriation.").[15]  Because a showing of misappropriation is required to establish a claim for unfair competition, for his unfair competition claim to survive summary judgment, Wexler must come forward with facts showing genuine issues as to both novelty and use.[16]

---

[15]    Under New York law, unfair competition claims also require a showing of bad faith.  *See Abe's Rooms, Inc. v. Space Hunters, Inc.*, 38 A.D.3d 690, 692 (2007) ("As to the . . . cause of action alleging common-law unfair competition, to sustain such a claim, the plaintiffs must show that the defendants misappropriated the plaintiff's labors, skills, expenditures, or good will and displayed some element of bad faith in doing so.").  Because there is no genuine dispute of material fact as to misappropriation, the Court does not consider whether Wexler has made the requisite showing with respect to bad faith.

[16]    Like with his other claims, Wexler frames his unfair competition claim in terms of both novelty and use. *See* Compl. ¶¶ 105–107 (alleging that Hasbro's wrongful exploitation and use of Plaintiff's novel and creative ideas constitutes unfair competition under New York law).

### D.  Unjust Enrichment

Under New York law, to prove unjust enrichment, a plaintiff must establish that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  The basis for Wexler's unjust enrichment claim is that "Hasbro used and exploited" his ideas and that "[i]t is unjust for Hasbro to retain the value of Plaintiff's novel and creative general and specific *Mash-Up* ideas and applications without compensating Plaintiff."  Compl. ¶¶ 111, 113.  If Hasbro did not use Plaintiff's ideas, or if Plaintiff's ideas were not novel,[17] Wexler would have no claim for unjust enrichment.  Accordingly, in the context of the fact at issue in this case, Wexler's unjust enrichment claims requires a showing that his ideas were novel and that Hasbro used them.[18]

In short, to prevail on summary judgment, Hasbro must show that no reasonable juror could find either that Wexler's ideas were novel or that Hasbro used any idea that was novel.

## II.    There Is No Question of Fact that Plaintiff's Mash-Up Idea Was Not Novel[19]

Wexler describes his Mash-Up Idea as "a branded collection of combined games, each of which is controlled by Hasbro, and uses combined play pattern of the original games and the games' names together as the name of the new product."  Resp. at 11.   Wexler's Mash-Up Idea

---

[17]     The law does not protect against the use of ideas that are not novel.  *See, e.g.*, *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir. 2000) ("[U]noriginal, known ideas have no value as property and the law does not protect against the use of that which is free and available to all.").

[18]     In all events, Wexler's unjust enrichment claim fails because it is duplicative of his other claims.  In New York, "unjust enrichment is not a catchall cause of action to be used when others fail.  It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. . . . An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (collecting cases).

[19]     Because there is no genuine dispute of fact that Wexler's Mash-Up Idea was not novel, the Court does not consider whether there is a dispute of material fact as to whether Hasbro used that idea.

can be distilled down to the following four elements: (1) each product in the collection combines elements of game play from two preexisting products, *see, e.g.*, Pl. 56.1 Stmt. ¶ 236; (2) the products involved are Hasbro classics that invoke consumer nostalgia and good-will, *id.* ¶¶ 233–234, 236–237, 321;[20] (3) the names of the products in the collection utilize the preexisting names of the component products, *id.* ¶¶ 238, 241;[21] and (4) the collection involves a line of products, *id.* ¶ 236.[22]  At issue is whether the idea, comprising those four elements, is novel.

"The determination of whether an idea is original or novel depends upon several factors, including, *inter alia*, the idea's specificity or generality (is it a generic concept or one of specific application?), its commonality (how many people know of this idea?), its uniqueness (how different is this idea from generally known ideas?), and its commercial availability (how widespread is the idea's use in the industry?)." *Nadel*, 208 F.3d at 378.  *See also Lapine*, 918 N.Y.S.2d at 321 ("An idea will not be considered novel if it is in the public domain." (citing *Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 784 (1980)); *AEB & Assocs. Design Grp.*, 853 F. Supp. at 734 ("[A] a plaintiff may not claim that an idea is original if it was already in use in the

---

[20]     The parties agree that Hasbro classics are its longstanding games, although Hasbro disputes whether the term "classics" has a formal definition within the company.  Pl. 56.1 Stmt. ¶ 234 (Def. Resp.).  But whether Hasbro and Wexler agree that the games he proposed in fact involved the combination of two Hasbro "classics" is of no moment to the ultimate question of whether Wexler's idea was novel.

[21]     Although he never explicitly says so, Wexler appears to contend that the use of the two preexisting names in the combined product is what makes the product a "Mash-Up."  *See, e.g.*, Def. 56.1 Stmt. ¶ 171 (Pl. Resp.) ("Uno Stacko [a product combining the games Uno and Jenga] is not a 'mash-up.'  It combines the play patterns of two games, but does not use the names of the two games being combined.  'Stacko' is not a game.").

[22]     Another characteristic of Wexler's Mash-Up Idea is that the name of the collection includes the phrase "Mash-Ups."  Pl. 56.1 Stmt. ¶ 239; *see also id.* ¶ 240 ("Wexler designed, prepared, presented and submitted to Hasbro two-dimensional artwork including a collection identifier or slogan 'Hasbro Presents … Mash-Ups … The Classics Combined.'").  But Wexler contends that his use of the phrase "Mash-Ups" is irrelevant to the legal question of whether the proposed collection was a novel idea.  *See* Resp. at 11 ("Ultimately, however, the issue of the novelty of the Hasbro Classics Mash-Ups Collection does not turn on the use of the word 'mash-ups.'  Whether the collection had been named 'mash+ups' or 'Combo Games' is irrelevant.  The issue is whether the underlying idea presented by Wexler, which included a proposed name for Hasbro's consideration, was novel.").  Because the Court is considering the combined elements of the Mash-Up Idea in determining whether any reasonable juror could conclude that the idea was novel, the name of the product is not pertinent.

industry at the time of the submission.").  Even when the facts are construed in the light most favorable to Wexler, each factor favors a finding that Wexler's Mash-Up Idea was not novel.[23]

With respect to the first factor, Wexler's Mash-Up Idea is a general idea for a generic concept.  The four elements are general descriptions of what the ultimate products in a line could look like; there is nothing specific about the idea.  Wexler argues that his idea was made specific given the "numerous examples of combinations that could be included in the collection, supported with prototypes, two-dimensional artwork, proposed packaging, and instructions." Resp. at 7–8.  Wexler is correct that he supported his idea with examples of products that could be included in such a collection.  *See* Pl. 56.1 Stmt. ¶¶ 243, 244, 253, 255, 258, 260; Def. 56.1 Stmt. ¶¶ 32–33.[24]  If the question was whether any one of those illustrative examples was novel, there may be a dispute of material fact as to the novelty of that particular idea.  But Hasbro did not develop any of the specific illustrative examples pitched by Wexler.  *See* Def. 56.1 Stmt. ¶¶ 38, 42, 45, 49, 52, 54, 133.  Moreover, Wexler cites no authority, and the Court is aware of none, to support his contention that a generic idea becomes novel when specific, but unused,

---

[23]     Under New York law, what is considered novel may be different in contract-based claims versus property-based claims like misappropriation.  In contract-based claims, "a showing of novelty to the buyer will supply sufficient consideration to support a contract."  *Nadel*, 208 F.3d at 376.  "By contrast, misappropriation claims require that the idea at issue be original and novel in absolute terms."  *Id.* at 380.  *But see Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 320 (Sup. Ct. N.Y. Cnty. 2011) (disagreeing with *Nadel*'s finding that contract-based claims use a "novelty to the buyer" standard and holding that both contract and property claims require a finding of absolute novelty).

Even presuming that there is a difference between what is considered novel in contract-based and property-based claims, an idea may be "so unoriginal or lacking in novelty generally that, as a matter of law, the buyer is deemed to have knowledge of the idea."  *Nadel*, 208 F.3d at 380.  In such cases, a plaintiff lacks both contract-based and a property-based claims.  *Id.*  In this case, the Court finds that the Mash-Up Idea is so lacking in novelty generally that the lack of novelty is imputed to Hasbro.  Accordingly, any distinction that might exist under New York law between contract-based and property-based claims is of no moment.

[24]     For example, Wexler proposed a game combining Monopoly and Trouble at several meetings, which he claims to have pitched as both as an illustrative example of his proposed collection and as a "stand-alone product." *See* Def. 56.1 Stmt. ¶ 32 (Pl. Resp.); Pl. 56.1 Stmt. ¶¶ 253, 255, 258.  Over the years, Wexler proposed the stand-alone product under three different names: "8-Minute Monopoly," "Speed Monopoly," and "Monopoly Taking Chances."  Pl. 56.1 Stmt. ¶¶ 253, 255, 258.  Hasbro ultimately passed on all versions of a game combining Monopoly and Trouble.  Def. 56.1 Stmt. ¶¶ 34, 42, 45, 49.

applications of that idea are also presented.  Accordingly, the first factor weighs in favor of the conclusion that Wexler's idea was not novel.

With respect to the remaining factors, each of the four elements comprising Wexler's Mash-Up Idea is so common and commercially available in the toy and game industry that a reasonable jury would have to conclude that the idea is not unique and is "nothing more than a variation on a basic theme." *AEB & Assocs. Design Grp.*, 853 F. Supp. at 734.  With respect to the first element of his Mash-Up Idea, that each product in the collection combines elements of game play from two preexisting products, Wexler admits that "the concept of combining play elements from two or more preexisting products to create a new, distinct play pattern is one of the most longstanding and ubiquitous game design techniques in the industry."  *See* Def. 56.1 Stmt. ¶ 152 (Pl. Resp.).  Moreover, Hasbro points to several examples of products from the toy and game world that combine play elements from existing games into a new game.  *See* Def. 56.1 Stmt. ¶¶ 171–172 (describing "Uno Stacko," a game released in 1994 that combined play elements from Uno and Jenga); *id.* ¶¶ 159–160 (describing "Poker Tiles," which combined play elements from Scrabble and poker); *id.* ¶ 174 (describing "Cranium," a game released in 1998 that combined play elements from Pictionary, charades, Trivial Pursuit, and Celebrities); *id.* ¶ 179 (describing "Girl Talk Jenga," which combined play patterns from the games Girl Talk and Jenga); *id.* ¶ 176 (showing a line of games from the 1960s and 1970s that combined the game Skittle with other games).

With respect to the second element of his Mash-Up Idea, that the two preexisting products are Hasbro classics that invoke consumer nostalgia and good-will, Wexler admits that an "important aspect of brand development for any game company is introducing new products associated with an established brand so that the new product, once on the market, can benefit from existing brand equity, and hopefully enhance it."  Def. 56.1 Stmt. ¶ 155 (Pl. Resp.).  Wexler

also admits that Hasbro has sold new versions of its classic games, implicitly admitting that products that incorporate this element are, and have been for years, commercially available. *Id.* ¶¶ 109–110 (describing Hasbro's "capsule" program with Target, "under which Hasbro has sold exclusive lines of games to Target based on Hasbro's classic brands"); *id.* ¶ 178 (describing the game "Monopoly: Transformers," which is a combination of two Hasbro classics).

The third element of his Mash-Up Idea, that the name of the product utilizes the preexisting names of the two component games, is also not unique. Using the names of the preexisting products capitalizes on brand equity, an idea that Wexler admits is common in the industry. Def. 56.1 Stmt. ¶ 155 (Pl. Resp.). Moreover, products that do just that are commercially available. *Id.* ¶ 179 (describing "Girl Talk Jenga," a game that combines Girl Talk and Jenga); *id.* ¶ 178 (describing "Monopoly: Transformers," a special edition of Monopoly using Transformers characters); *id.* ¶ 176 (describing the line of "Skittle" games; games in that line combine the name of the game "Skittle" with the name of other preexisting games).

With respect to the final element of his Mash-Up Idea, that the collection is a line of products, Wexler admits that "[i]nventors commonly present their proposed concepts in the context of product lines . . .." Def. 56.1 Stmt. ¶ 188 (Pl. Resp.). Moreover, Hasbro has released many lines of toys and games over the years. *Id.* ¶ 181 (describing a 2007 line of toys called "Telepods," which combined "Angry Birds" and "Transformers"); *id.* ¶ 182 (describing another 2007 line of toys called "Mixable, Mashable Heroes," which combined Marvel characters and Mr. Potato Head); *id.* ¶¶ 109–110, 191 (discussing lines of Hasbro collections sold at Target).

Put another way, none of the four constituent elements of Wexler's Mash-Up Idea is novel; each is commonly known and commercially available. That said, Hasbro admits that prior to the "game mash+ups" line it sold to Target, it "had not created or sold a line of new games by combining elements of game play of two Hasbro Classic brands for each new product, and

wherein the new products would be sold under a common identifying name, brand or slogan."

Pl. 56.1 Stmt. ¶ 301 (Def. Resp.).  The remaining question, therefore, is whether Wexler's idea to

combine those four known elements was itself a novel idea.

Under New York law,

> an idea which is a variation on a basic theme will not support a finding of novelty.
> Thus, even though an idea need not reflect the flash of genius to warrant
> protection, it must show genuine novelty and invention, and not a merely clever
> or useful adaptation of existing knowledge.  Improvement of standard technique
> or quality, the judicious use of existing means, or the mixture of known
> ingredients in somewhat different proportions — all the variations on a basic
> theme — partake more of the nature of elaboration and renovation than of
> innovation.

*Paul*, 183 A.D.2d at 53 (internal citations and quotations omitted) (collecting cases); *see also*

*Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 450 F. Supp. 2d 175, 180 (D. Conn. 2006)

(applying New York law) (differentiating between "novelty of an idea," which is protected, and

"novelty of its execution," which is not).

Although a steep hill to climb, novelty can be proven even when the idea utilizes

elements that are themselves not novel.  *See Victor G. Reiling Assocs.*, 450 F. Supp. 2d at 179–

81 (Although "most new ideas incorporate as building blocks elements or assumptions that are in

the public domain, . . . if the idea itself is original, rather than just a new way of executing an old

idea, it is protectible."); *AEB & Assocs. Design Grp.*, 853 F. Supp. at 734 (noting that "even

original ideas combine elements that are themselves not novel," but recognizing that "novelty

cannot be found where the idea consists of nothing more than a variation on a basic theme").

In this case, however, Wexler's Mash-Up Idea is simply "the judicious use of existing

means, or the mixture of known ingredients in somewhat different proportions."  *Paul*, 183

A.D.2d at 53.[25]  Such ideas are not novel.  The Second Circuit, for example, affirmed a district

court's finding that the idea for a television show featuring a Black American family was not

novel, because it "merely combined two ideas which had been circulating in the industry for a

number of years — namely, the family situation comedy, which was a standard formula, and the

casting of black actors in non-stereotypical roles," despite recognizing that "the portrayal of a

nonstereotypical black family on television was indeed a breakthrough."  *Murray v. Nat'l Broad.

Co.*, 844 F.2d 988, 991, 992 (2d Cir. 1988), *abrogated on other grounds by Nadel*, 208 F.3d at

376–78.  Here, Wexler proposed combining a number of elements that "had been circulating in

the industry" for decades and followed a "standard formula" generally known in the industry.

Like the proposed sitcom in *Murray*, Wexler's idea is not novel.[26]

　　　In *AEB & Assocs. Design Grp., Inc. v. Tonka Corp.*, the court found that a prototype of a

commercial airbrush tool was not a novel idea even though it was the first airbrush tool to use a

"mechanism for hand pumping air into a canister."  853 F. Supp. at 734.  The court found that

although two other airbrush tools used "manually-operated airbrush systems" that were different

from the hand pumping mechanism, the proposed prototype "consist[ed] of nothing more than a

clever or useful adaptation of existing knowledge."  *Id.* (internal citation omitted).  Here, none of

---

[25]　　Wexler argues that Hasbro's reliance on a "litany of pre-existing combination products dating back sixty years" "unintentionally underscores the novelty and commercial viability" of his Mash-Up Idea because "Hasbro does not contend that those products were not novel or that the inventors of such products were not entitled to a royalty."  Resp. at 10.  As an initial matter, it is self-evident that ideas that were, at some point, novel, lose their novelty as they are disseminated and become widely known.  *Nadel*, 208 F.3d at 378.  Moreover, if one of Wexler's illustrative examples, like Monopoly Trouble, were at issue, the Court could find that even though the four elements are themselves not novel, the application of those elements to the specific idea could be novel.  But that is far cry from the general, generic concept at issue here.

[26]　　Even if the *Murray* Court had found the proposed sitcom to be novel, it would not necessarily mean that Wexler's Mash-Up Idea was novel.  In *Murray*, the plaintiff had proposed a television program; his proposal included a title ("Father's Day"), casting suggestions, that the program would feature a Black family in non-stereotypical professions, and that it would mix humor with serious situations.  *Murray v. Nat'l Broad. Co.*, 844 F.2d 988, 990 (2d Cir. 1988).  That was a specific idea for a television show; unlike Wexler's Mash-Up Idea, it was not a general, generic concept.

the elements that Wexler proposed in his Mash-Up Idea is different from elements found in other generally available products.[27]  Even if any one of the elements had been slightly different from what existed in the industry, Wexler's idea is, at best, "a clever or useful adaptation of existing knowledge."[28]

In short, Wexler has not shown that there is a dispute of material fact whether his Mash-Up Idea is novel.  Because novelty is an element of each of his legal claims, Hasbro's motion for summary judgment on all claims related to Wexler's Mash-Up Idea is granted.

## III.   There Is No Question of Fact that Hasbro Did Not Use Plaintiff's Connect 4/Nerf Idea[29]

Hasbro contends that it independently developed Connect 4 Blast!; it did not use Wexler's Connect 4/Nerf idea in creating the game.  Mem. of Law, Dkt. 47 at 8–9.  As discussed in Section I *supra*, for Plaintiff to survive summary judgment, there must be a question of fact whether Hasbro used Wexler's idea.  *See, e.g.*, *Nadel*, 208 F.3d at 380 n.10 ("In order to recover for breach of contract, a plaintiff must demonstrate some nexus or causal connection between his or her disclosure and the defendant's use of the idea, *i.e.*, where there is an independent source for the idea used by the defendant, there may be no breach of contract, and the plaintiff's claim for recovery may not lie."); *AEB & Assocs. Design Group*,  853 F. Supp. at 734 ("[E]ven where a

---

[27]    Moreover, unlike Wexler's Mash-Up Idea, the plaintiff's proposed product in *AEB & Assocs. Design Grp.* involved a specific application — a prototype — as opposed to a generic idea of general application.

[28]    Wexler argues that the facts in *AEB & Assocs. Design Grp.* are not analogous to his Mash-Up Idea.  He claims that in *AEB*, the inventor "merely adapted a mechanism already incorporated into an existing product."  Resp. at 9 n.3 (citing *AEB & Assocs. Design Grp.*, 853 F. Supp. at 734).  He contrasts that with his Mash-Up Idea, which did not "adapt one mechanism of an existing product" or otherwise "adapt existing knowledge.'"  *Id.*  He claims that, instead, his Mash-Up Idea involved "a new line of new products of unique value to Hasbro . . . that creates a new way of playing . . . classic game[s] while permitting Hasbro to leverage the brands that are being combined."  *Id.*  But this generic description of his Mash-Up Idea does nothing to rebut the fact that the components of his idea are all "existing knowledge" and that combining those elements together is simply an adaptation of that knowledge.

[29]    Because there is no dispute of material fact whether Hasbro used Wexler's Connect 4/Nerf idea, the Court does not consider whether there is a question of fact whether that idea was novel.

plaintiff's concept is novel and original, recovery will be denied where it is established that the party alleged to have misappropriated another's concept, arrived on its own initiative or by wholly independent means at a concept similar to that devised by the party seeking recovery for misappropriation." (cleaned up)).

In misappropriation of idea cases, courts use a burden-shifting framework in deciding whether a defendant used a plaintiff's idea.  "[A] plaintiff can establish misappropriation by showing access and substantial similarity, which shifts the burden to the defendant to demonstrate independent development."  *Scienton Techs., Inc. v. Computer Assocs. Int'l Inc.*, No. 04-CV-2652, 2012 WL 13105453, at *11 (E.D.N.Y. Sept. 25, 2012) (internal citations omitted) (collecting cases).  If a defendant demonstrates independent development, the burden shifts back to the plaintiff to rebut the defendant's evidence of independent development.  *AEB & Assocs. Design Grp., Inc.*, 853 F. Supp. at 734–35.  Although contract claims do not use the same burden shifting standard, to survive summary judgment, Wexler must still come forward with "specific facts showing that there is a genuine issue for trial" on the question of whether Hasbro used his idea.  *Sista v. CDC IXIS N. Am., Inc.*, 445 F.3d at 169.  Because Hasbro's evidence that it independently developed Connect 4 Blast! is unrefuted and because Wexler's has not put forth anything beyond speculation to show that there is a genuine dispute as to whether Hasbro used his idea, his claims related to his Connect 4/Nerf idea do not survive summary judgment.[30]

---

[30]     The Court presumes without deciding that there are genuine disputes of material fact whether his Connect 4/Nerf idea is substantially similar to Connect 4 Blast! and whether Hasbro had access to Wexler's idea.

### A. Hasbro's Evidence that It Independently Developed Connect 4 Blast!

According to Hasbro, in February 2019, one of its designers, Matthew Shoaff, independently developed the game Connect 4 Blast!  Mem. of Law at 8–9.  Hasbro offers two pieces of evidence to support its contention: deposition testimony from Michael Lichodziejewski and a sworn declaration from Matthew Shoaff.  Lichodziejewski was Shoaff's supervisor at Hasbro.  Def. 56.1 Stmt. ¶ 138.  At his deposition, Lichodziejewski testified that the "basic concept [for Connect 4 Blast!] originated with Matt Shoaff."  Lichodziejewski Tr., Dkt. 52-16 at 59:7-10.  *See also id.* at 65:18-19 ("The creation of the concept came from Matt Shoaff alone.").[31]  Additionally, Shoaff testified in a sworn declaration that he "came up with th[e] idea entirely on [his] own."  Shoaff Decl., Dkt. 69 ¶ 10.  *See also id.* ¶ 23 ("Before being informed about this litigation, I had never seen, been told of, or had any awareness of any inventor submission by David Wexler, and in particular I was never made aware of any game idea that he had submitted involving Nerf and Connect 4.").

Wexler's argues that Hasbro did not present any testimony from Shoaff directly and that Lichodziejewski's deposition testimony is inadmissible hearsay because it "is necessarily based on what he was told by Schoaff [sic] or, no more reliably, rank speculation."  Resp. at 19.  Shoaff's sworn declaration was included as part of Hasbro's reply in support of its motion for summary judgment, so Wexler was correct that, when he filed his response brief, Hasbro had not presented any evidence from Shoaff himself.  Although "[a]rguments made for the first time in a reply brief need not be considered by a court," district courts have discretion to "rely on evidence submitted with moving party's reply papers."  *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (internal citations omitted).

---

[31]     Lichodziejewski further testified that Shoaff first presented the idea to him.  Lichodziejewski Tr., Dkt. 52-16 at 61:5-11, 61:18-20.

In an exercise of its discretion, the Court is inclined to consider Shoaff's sworn declaration.  Courts consider a variety of factors in deciding whether to rely on evidence submitted in reply papers.  In *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, the Second Circuit looked to the following four considerations in deciding whether a district court had abused its discretion in relying on new evidence found in reply papers: (1) whether the reply was the first opportunity to rebut new material issues raised in the opposition papers; (2) whether the non-moving party was surprised by the evidence included in the reply;[32] (3) whether the non-moving party sought leave to file a sur-reply to respond to the evidence;[33] and (4) whether there is any indication that the non-moving party has "any contrary evidence to introduce even if it were given an opportunity to proffer it."  215 F.3d 219, 226–27 (2d Cir. 2000).

Three of the four considerations counsel in favor of considering Shoaff's declaration, even though it appeared for the first time in Hasbro's reply papers.  Hasbro's independent development *vel non* of Connect 4 Blast! was not a new issue raised for the first time by Wexler in its opposition to Hasbro's motion for summary judgment.  Accordingly, the first factor weighs against considering the Shoaff declaration.  But the remaining three factors tip the balance in the other direction.  Wexler could not have been surprised by the Shoaff declaration because its contents mirrored Lichodziejewski's deposition testimony.  Moreover, it was Wexler who pointed out that Hasbro had not included any evidence from Shoaff himself.  Resp. at 19.

---

[32]   *See also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (considering whether the non-moving party was "blindsided" by the new evidence in the reply); *Cifarelli v. Village of Babylon*, 93 F.3d 47, 53 (2d Cir. 1996) (holding that the district court did not abuse its discretion in considering a new affidavit submitted by a defendant on reply inasmuch as plaintiff was "fully aware prior to the defendants' reply" of the issue discussed in the affidavit).

[33]   *See also Ruggiero*, 424 F.3d at 252 (finding that "it is hard for [the non-moving party] to claim unfair prejudice now, because she could have claimed surprise in the district court and sought to file a responsive sur-reply").

Additionally, Wexler did not move for leave to file a sur-reply in response to the new evidence; nor did Wexler move to strike the Shoaff declaration.[34]  Further, the Court has absolutely no indication that Wexler has any evidence to contradict Shoaff's sworn statements.  Whether Connect 4 Blast! was independently developed by Hasbro is squarely at issue in this litigation and is discussed extensively in Hasbro's opening papers.  If Wexler has additional evidence to refute Hasbro's position that Shoaff independently conceived the idea, he surely would have included that evidence in his opposition papers.  The fact that he did not persuades the Court that Wexler has no such evidence.  In short, the Court will exercise its discretion to consider the Shoaff declaration.

But even if the Court decided not to consider the Shoaff declaration, it could rely on Lichodziejewski's testimony, even though it is, in part, hearsay.  "Hearsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial."  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.")).[35]  The contents of the statements in Lichodziejewski's testimony to which Wexler objects as hearsay would be admissible at trial in the form of Shoaff's direct testimony.  *See* Shoaff Decl. ¶ 1 (noting that "if

---

[34]   Wexler was keenly aware of the option to move to strike Shoaff's declaration.  Hasbro sought leave to move to strike one of the declarations attached to Wexler's opposition papers and followed the pre-motion procedures in the Undersigned's Individual Practices in Civil Cases.  After a telephone conference on the request, the Court declined to grant Hasbro leave to file a motion to strike.  *See* Order, Dkts. 65; Joint Letter, Dkt. 72; Order, Dkt. 73.  Wexler did not take any similar actions with respect to the Shoaff declaration.

[35]   *See also Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 427 F. Supp. 3d 582, 598 n.29 (D. Md. 2019), *aff'd*, 14 F.4th 276 (4th Cir. 2021) ("Summary judgment evidence must either be in admissible form or capable of being rendered admissible at trial.") (citing *Humphreys & Partners Architects, LP v. Lessard Design, Inc.*, 790 F.3d 532, 538-39 (4th Cir. 2015)).

called as a witness [he] could, and would, testify").  In short, the Court may consider

Lichodziejewski's testimony when deciding Hasbro's motion for summary judgment.

Considering Lichodziejewski's testimony and Shoaff's declaration, Hasbro has put forth

evidence that it independently developed Connect 4 Blast!

**B. Wexler's Rebuttal of Hasbro's Evidence That Connect 4 Blast! Was Independently Developed Is Entirely Speculative**

To create a question of fact whether Hasbro used Wexler's Connect 4/Nerf idea, Wexler

must rebut Hasbro's evidence that Connect 4 Blast! was independently developed by coming

forward with specific facts to show that there is a genuine issue for trial.  *AEB & Assocs. Design

Grp., Inc.*, 853 F. Supp. at 734–35.  A rebuttal comprised solely of "conclusory and speculative

assertions" is "insufficient to avoid summary judgment."  *Id.* at 735.  Moreover, "[t]he party

opposing the motion for summary judgment must set forth concrete particulars [and] [i]t is not

sufficient merely to assert a conclusion without supplying supporting arguments or facts."

*BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (citing

*SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)).  Because all of Wexler's

evidence is unsubstantiated speculation, he has not rebutted Hasbro's evidence of independent

development.

Wexler puts forth what he refers to as "information concerning certain general practices

at Hasbro," *see* Resp. at 17, without providing any evidence specific to his Connect 4/Nerf idea.

Wexler speculates that his Connect 4/Nerf idea may have been presented to others within Hasbro

after his initial pitch meeting on April 30, 2015, because the idea was marked "Hold/Send In."[36]

Wexler asserts that "in the vast majority of cases an idea presented by an inventor that a member

---

[36]     The parties agree that at the conclusion of the initial pitch meeting, Hasbro marked the idea as "Hold/Send In" on the Inventor Review Record form.  Pl. 56.1 Stmt. ¶¶ 270, 343.

of Hasbro's product acquisitions group marks HOLD/SEND IN is presented at what is referred to as an Inventor Submission Review meeting ("ISR") to a group of up to 20 Hasbro employees, including members of the marketing and product development groups, for discussion and further evaluation." Resp. at 17.[37]  Wexler then notes that "[o]ther than a single agenda, it appears that Hasbro has not produced any information concerning ISR meetings at which ideas presented by Wexler were presumably discussed, or any evidence that his ideas that were brought in [were] not presented at an ISR." *Id.*; Pl. 56.1 Stmt. ¶¶ 445, 447.  Wexler also asserts that "toy and game creation is a collaborative process at Hasbro," and "it is a general practice for employees to speak with [one] another to get their input even outside of the formal review meetings." Resp. at 18 (citing Pl. 56.1 Stmt. ¶ 448).

But even if all of those assertions are true, Wexler has offered no facts that tend to show that his Connect 4/Nerf idea was presented at an ISR meeting or discussed informally among Hasbro employees.  And even if he had presented such evidence, Wexler has provided nothing to connect the Hasbro employees who were allegedly exposed to his idea to Shoaff or to any other Hasbro employee who was purportedly involved in the creation of Connect 4 Blast!  Wexler's speculation that his idea could have been presented at an ISR meeting and a person present at that meeting then could have discussed Wexler's idea with someone who then could have discussed it with Shoaff is insufficient to raise a question of fact for trial.[38]

---

[37]   The Hasbro representative at the April 30, 2015 meeting testified at his deposition that about 30 percent of items marked "Hold/Send In" would "not make it to a further stage." *See* Grimes Tr., Dkt. 60-3 at 310:20-311:10. Ronald Weingartner, Wexler's expert who worked in the Inventor Relations department at Hasbro from 1986 to 1999, testified at his deposition that only about 10% of ideas marked "Hold/Send In" are not shared with others. Weingartner Tr., Dkt. 52-3 at 187:19; Def. 56.1 Stmt. ¶¶ 25–27.

[38]   It is of no moment that "Hasbro has not produced any information concerning ISR meetings." Resp. at 17. To survive summary judgment, the non-moving party has to come forward with specific facts showing that there is a dispute of material fact.  If Wexler believed that Hasbro did not meet its obligations in discovery, he should have brought his complaint to the Court's attention or filed a motion to compel.  Wexler did neither.

Wexler continues his speculation by noting that "all of the ideas presented to Hasbro and included on an IRR, whether marked HOLD/SEND IN or PASS, are logged in a computer database — initially Greenhouse and now Ignite," and that "Hasbro reviews previously submitted ideas in an effort to identify potential products to develop."  Resp. at 17; *see also* Pl. 56.1 Stmt. ¶¶ 450–454.  But here, too, Wexler provides no facts tending to show that an entry for his Nerf/Connect 4 idea was made or accessed or that any such entry that may exist was shared with the Hasbro employee or employees responsible for developing Connect 4 Blast![39]  The mere existence of a database that may have housed Wexler's idea does not move the needle; Wexler needed to present some fact that would allow the trier of fact to connect information in the database to the development of Connect 4 Blast!

Wexler's final attempt to rebut Hasbro's evidence of independent development is his "special mention" of Jonathan Berkowitz, who Wexler claims was both at the April 30, 2015 meeting at which Wexler pitched his Connect 4/Nerf idea and played a role in Hasbro's production of Connect 4 Blast!  Resp. at 18–19.  But a careful review of the evidence reveals that Wexler's contention is mere speculation.

Jonathan Berkowitz was "in charge of Hasbro's game division from April 2011 to January 2020."  Def. 56.1 Stmt. ¶ 68.  Hasbro admits "for the purposes of the Motion" that Berkowitz was "present for some portion or portions" of the April 30, 2015 meeting, during which Wexler presented his Connect 4/Nerf idea.  Pl. 56.1 Stmt. ¶ 259 (Def. Resp.).  The Court

---

[39]     Wexler again blames Hasbro, noting that the company "does not maintain (or simply has not produced) any records of who accesses these databases and when, and [which] people outside of the Product Acquisition group are provided access to the database."  Resp. at 17–18.  *See also* Pl. 56.1 Stmt. ¶ 452 ("Hasbro produced no information [about] who accessed the databases to review the ideas submitted by Wexler . . . .").  It is, of course, Wexler's burden to rebut Hasbro's evidence of independent development by coming forward with specific facts showing that there is a genuine issue for trial.  Wexler's speculation about what may have happened vis-à-vis a database at Hasbro cannot create a dispute where none exists.  Here, too, if Wexler believed Hasbro was not fully forthcoming during the lengthy discovery period, he could have raised a discovery dispute with the Court or filed a motion to compel.  As noted previously, Wexler did neither.

will assume without deciding that this creates a question of fact whether Berkowitz heard or learned of Wexler's presentation of his Connect 4/Nerf idea. But Wexler has provided no evidence that Berkowitz had a hand in the invention of Connect 4 Blast! At his deposition, Berkowitz was asked how Connect 4 Blast! "came to be invented." Berkowitz Tr., Dkt. 53-19 at 114:5. Berkowitz replied, "I don't know. I don't remember exactly how it came to be invented. I think — I believe it was presented to me by our design team." *Id.* at 114:6-8. Berkowitz also testified that he approved the production of the game. *Id.* at 114:9-11. Michael Lichodziejewski testified that, at the relevant time, Berkowitz was part of the Hasbro leadership team and that after Shoaff presented the idea for Connect 4 Blast! to him, "[w]e took [Shoaff's] concept along with a couple of other Connect 4 concepts . . . , and brought those with a bunch of other products we were working on at the time to present to the senior leadership to get feedback on them." Lichodziejewski Tr., at 62:10-22. Lichodziejewski further testified that Berkowitz "was not involved in the creation of the concept. He may have had some influence of the development over time to get to production but he was not involved in the creation of the initial concept." *Id.* at 63:4-9. That testimony does not create a question of fact whether Berkowitz had a role in the invention of Connect 4 Blast![40] There is some evidence that Berkowitz *approved* the Connect 4 Blast! Concept, but there is no evidence that he was involved in creating it.

Accordingly, given Hasbro's evidence of independent development, and the fact that Wexler has only conclusory and speculative assertions to rebut that evidence, Wexler cannot avoid summary judgment. *AEB & Assocs. Design Grp.*, 853 F. Supp. at 734–35. Because there is no question of fact whether Hasbro used Wexler's Connect 4/Nerf idea and because such use

---

[40] Even if there were a question of fact whether Berkowitz was involved in the invention of Connect 4 Blast!, there is nothing in the record that would tend to show that Berkowitz recalled Wexler's Connect 4/Nerf idea from four years prior or that he used what he remembered in connection with the invention of Connect 4 Blast!

is an essential element of each of Wexler's legal claims, Hasbro's motion for summary judgment on all claims related to Wexler's Connect 4/Nerf idea is granted.

## CONCLUSION

For the foregoing reasons, Hasbro's motion for summary judgment is GRANTED, and Wexler's claims are DISMISSED with prejudice.

The Clerk of Court is respectfully directed to terminate all open motions and to close this case.


**SO ORDERED.**

**Date:  March 11, 2022**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**